84 N.J. Super. 461 (1964)
202 A.2d 466
SALVATORE SAUTTO, ET AL., PLAINTIFFS-RESPONDENTS,
v.
EDENBORO APARTMENTS, INC., A CORPORATION, ET AL., DEFENDANTS-APPELLANTS, AND THE CITY OF ORANGE, INTERVENOR-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 25, 1964.
Decided July 7, 1964.
*463 Before Judges GAULKIN, FOLEY and LEWIS.
Mr. Lee A. Holley argued the cause for appellants.
Mr. Elmer O. Goodwin argued the cause for respondents (Mr. Harry M. Creo, on the brief).
The opinion of the court was delivered by LEWIS, J.A.D.
This is a proceeding in lieu of prerogative writs to enforce the side yard restrictions of a municipal zoning *464 ordinance. The Superior Court, Law Division, entered judgment for plaintiffs, the effect of which is to compel the total or substantial demolition of a high-rise apartment building. We granted a stay pending defendants' appeal.
This case was previously before this court. We reversed and remanded the matter for plenary trial. Sautto v. Edenboro Apartments, Inc., 69 N.J. Super. 420 (App. Div. 1961). We are now presented with a full record, and, to obtain a proper perspective for an equitable approach to the issues involved, it is necessary to review the salient facts at some length.
In 1954 vacant lands known as 82-84 High Street in the City of Orange were acquired by George B. Underwood and his wife for the price of $15,000. Five years later, in order to develop their real estate purchase for resale, the Underwoods engaged an architect, Max Simon, a specialist in the design of multi-family dwellings, to prepare plans for a proposed apartment house to be erected on the site. A plot plan and schematic drawings were submitted by Simon to Joseph Kearns, the municipal building inspector, who advised the architect that there were no side line requirements under the 1922 zoning ordinance then in effect.
On January 14, 1960, following an original and two amended applications, the Federal Housing Administration (herein FHA) issued a letter of feasibility covering a proposal for a 64-unit (218 rooms) apartment building. By written communication from the building inspector, dated January 29, 1960, the owners' agent was advised that "this type of structure is definitely allowed on this site" and that the required building permit would be issued when the building plans were completed. Negotiations were then undertaken by the owners to secure a purchaser for the land and the FHA project.
In February 1960 a contract of sale was entered into with a designated corporation controlled by individuals including one Arnold I. Harris (herein Harris Group). The purchase price was $75,000, and the transaction was conditioned, inter alia, upon the issuance of a building permit, compliance with *465 local zoning, and the procurement of an FHA mortgage commitment of not less than $685,000. The sales contract also provided for its assignability to a New Jersey corporation to be organized in conformity with the requirements of the National Housing Act.
The City of Orange, on May 9, 1960, issued a permit to build in accordance with the plans submitted, which called for construction for a distance of approximately 45 feet along the side lines of the premises. In July of that year an FHA insurance commitment for a mortgage loan of $824,000 was received, and the following month defendant Edenboro Apartments, Inc., was incorporated under a charter approved by the FHA as the take-over corporation. The closing took place on September 9, 1960. Thereafter, on September 26 and 27 required test borings were made preliminary to the commencement of construction.
Owing to dissension in the Harris Group, efforts were directed toward the resale of the then "committed package." In due course Eugene Brown and Seymour J. Weiner (herein sometimes Brown Group), who were working for a New York construction firm, purchased the Edenboro project at an agreed price of $75,000 plus actual disbursements (not to exceed $21,250), the assumption of unpaid FHA charges, and the balance due on architect's fees (not to exceed $12,200). Their contract of purchase (December 1, 1960) was subject to the aforesaid building permit and financing commitment's being "valid and subsisting" at the time of closing title, which was agreed to be simultaneous with the FHA mortgage loan settlement. When Weiner and Brown were approved by the FHA as substituted project sponsors, they resigned their positions in New York  presumably to devote their full time and efforts toward completion of the various administrative steps necessary to effectuate the FHA closing, which was ultimately scheduled for April 21, 1961.
In the meantime, on March 7, 1961 the City of Orange adopted an amendment, effective March 9, 1961, to its 1922 zoning ordinance by the pertinent terms of which a ten-foot *466 minimum side yard was required for all proposed buildings in the apartment district wherein the property in controversy is situate. The amendment contained an exception, however, that where a building permit had been issued and construction work had been started before the effective date of the ordinance, such work might proceed, provided it was completed within one year from that date.
The Brown Group, upon learning of the new zoning enactment, contacted Kearns, the building inspector, who expressed unequivocally the opinion that the outstanding building permit was saved by the new legislation and therefore was still valid. On March 29, 1961 the building inspector wrote a letter to the permittee advising:
"Permit #22167 was issued on May 9, 1960 and is in full force and effect provided that this project is started prior to May 9, 1961 and is completed not later than March 7, 1962, as the present Zoning Ordinance of the City of Orange makes this exception.
A certificate of occupancy will be issued by this Department provided the building is completed prior to the aforementioned date above."
Additionally, one of the prerequisites of the FHA was a survey certificate pursuant to printed instructions on the reverse side of its formal questionnaire. Requirement No. 7 reads:
"All buildings on property must be shown with dimensions and relation to lot and building lines. If conditions in chain of title or zoning ordinances require buildings to be set back specified distances from street or property line, the required setback line must be shown and the survey must show MEASURED DISTANCES from said building to said line."
James F. DeCarlo, a civil engineer by profession, who held the position of assistant municipal engineer for the City of Orange, in his signed certification answered "Yes" to the question, "If any zoning or other municipal regulations affect the use of surveyed premises, do the improvements on the premises and the use made of them comply with such?" According to the certification, his last inspection of the property *467 was on April 4, 1961, and it appears from his testimony that he knew from the filed building plans that the proposed structure would extend to the side lines of the premises.
The position of the municipality, as stated in the pretrial order, is significant:
"The City of Orange contends that the action of the building inspector in allowing the construction of this building to proceed after the 1961 Zoning Ordinance was passed, is proper; (b) that the 1961 Zoning Ordinance protects the rights of the defendant owners and builders under the permit issued under the 1922 Zoning Ordinance as amended; (c) that the reliance of the defendant owners and builders on this permit is such that the City of Orange could not at this time pursue, or at the present time prevent the construction of this building."
On April 21, 1961 the transfer to the Brown Group and the mortgage settlement with The Trust Company of New Jersey were completed, at which time the payments required by the FHA for closing (approximately $58,624) were advanced by the mortgagor. At the same time, such documents as the construction contract, building loan agreement and performance bond were executed and delivered. The settlement officer and closing attorney, who had investigated the municipal requirements, testified that he submitted a written opinion stating affirmatively that there was compliance with local zoning. The initial advancement by the mortgagee trust company was made on April 24, 1961 in the amount of $42,852. Thereafter Calvin A. Liguori, the subcontractor for site clearing, commenced activity. His statement was that he first had men working on the property during the week ending April 27, 1961. The FHA records reveal that for payroll purposes construction started April 28, 1961.
The pending litigation then ensued against the owner, Edenboro Apartments, Inc., the construction contractor and the building inspector. Although suit was commenced April 28, 1961, notice thereof was not served upon defendants until May 4, 1961. Plaintiffs Salvatore Sautto and James A. Christiano and their wives, who owned and resided in dwellings *468 on either side of the property, sought by their complaint to set aside the building permit issued May 1960 for the construction of the proposed building without side yards. They claimed that the permit when issued was in conflict with the 1922 zoning ordinance and, if not, it nevertheless had been invalidated by the 1961 amendment which irrefutably requires ten-foot minimum side yards.
Defendants-appellants answered and counterclaimed, contending: their permit conformed with the 1922 ordinance requirements; it was saved under the terms of the 1961 amendment and, alternatively, the amendatory ordinance was invalid and of no legal effect; in any event, they were protected by vested rights, having substantially relied upon the permit; plaintiffs were in laches and their action was barred under R.R. 4:88-15(a). With leave of court, the City of Orange intervened to urge and support the constitutionality and validity of the 1961 ordinance.
On July 13, 1961 the trial court, on cross-motions for summary judgment, entered a judgment in favor of the defendants, predicating its opinion primarily on the issuance of the building permit under the 1922 ordinance and the fact that the defendants "had spent in excess of $160,000" on the project at the time of the institution of plaintiffs' suit. Plaintiffs obtained leave to appeal to the Appellate Division, which appeal was argued on October 9, 1961 and decided October 17, 1961. The case was remanded for trial, conformably with the opinion of Judge Conford as reported in Sautto v. Edenboro Apartments, Inc., supra, with directions that the remand "should obviously be proceeded with forthwith, in view of the continuing construction of this building." 69 N.J. Super., at p. 435. The Supreme Court refused to review the judgment on November 27, 1961.
The plenary hearing before the Law Division on remand did not commence until May 9, 1962. The trial and supplemental proceedings were concluded with the entry of a final judgment on February 21, 1963, by which time the apartment building was 98% completed and steps had been taken to *469 obtain a certificate of occupancy from the city. The judgment, in substance, declared appellants' apartment building to be in violation of the 1961 zoning enactment; directed the building inspector to enforce the ordinance as amended and, in particular, the side yard provisions thereof; ordered the project defendants to relocate the building to provide the requisite side yards; and enjoined and restrained defendant Edenboro from permitting any portion of its apartment building to remain on the areas required as side yards, and "to remove or cause to be removed all parts or portions of said building located upon any part of said side yard areas within 60 days of the effective date of this judgment."
Defendants' contention on appeal that plaintiffs should be barred from injunctive relief by reason of laches and the dilatory prosecution of their case is without merit and calls for no further comment. The crucial questions here to be resolved are (1) was there such a substantial reliance upon the building permit issued May 9, 1960 as to immunize its validity from the subsequent amendatory zoning ordinance, and (2) do the overriding equities balance out in defendants' favor as against the complaining taxpayers-owners.

I.
We note in limine certain legal questions previously decided in Sautto v. Edenboro Apartments, Inc., supra (69 N.J. Super. 420), which for present purposes must be considered the law of the case:
 The building permit was valid when issued. Id., at p. 426.
 There were no side yard requirements until the passage of the 1961 ordinance. Ibid.
 The mere making of soil tests, without further overt activity on the land itself, was not the start of construction within the intendment of the ordinance, even if the municipality and its building inspector so considered it. Id., at p. 429.
*470  The pertinent issue is not what was spent (or irrevocably committed) by the time suit was instituted, but rather by the effective date of the amending ordinance (March 9, 1961). Id., at p. 431.
 The decisions of our State have indicated that
"where a property owner has been granted a building permit for a use valid when granted, the municipality nevertheless has a right to adopt later zoning or other police power legislation restrictive of the enjoyment of the permit already issued, but not where the permittee in reliance upon the permit has made substantial investment or expenditure, or where the extent of his reliance and the nature of the behavior of the parties show a balance of the equities strongly in favor of the permittee as against the general public represented by the municipal authorities (or, as here, a complaining taxpayer-owner)." Id., at pp. 429-430.
The above-quoted language was again employed in Morris v. Postma, 41 N.J. 354, 362 (1964).
It is, therefore, clear that a building permit is not per se protected against revocation by subsequent prohibitory changes in zoning. The prevailing rule requires that reliance thereon be clearly established. See Roselle v. Moonachie, 49 N.J. Super. 35 (App. Div. 1958), reaffirming 48 N.J. Super. 17 (App. Div. 1957). But, as stated in Tremarco Corporation v. Garzio, 32 N.J. 448 (1960):
"It must be determined at what point it can be said that an individual has performed acts which form the wellspring from which certain protectable interests may flow and create a countervailing force which will prevail over the normally paramount authority of the municipality to preserve the desirable characteristics of the community through zoning. * * *
There is no easy formula to resolve issues of this kind. The ultimate objective is fairness to both the public and the individual property owner." (at pp. 456-7)
The judiciary has differed widely as to how much action or activity needs to be demonstrated by a permittee to fortify a claimed reliance to a point where an indefeasible status or a vested right under the issued permit obtains. The central theme throughout the authorities is that an analysis of the *471 nature and quantum of reliance is essential, and that ultimately each case must rest upon its own particular facts and circumstances. By way of illustration, a sufficiency of reliance was recognized in the following cases: Tremarco Corporation v. Garzio, supra; Atlantic Broadcasting Co. v. Wayne Twp., 109 N.J.L. 442 (E. & A. 1932); Freeman v. Hague, 106 N.J.L. 137 (E. & A. 1929); Lehigh Valley R. Co. v. Mayor & Aldermen of Jersey City, 7 N.J. Misc. 154, 144 A. 578 (Sup. Ct. 1929), affirmed per curiam 106 N.J.L. 248 (E. & A. 1929). See Annotation, "Rezoning  Infringement of Vested Rights," 138 A.L.R. 500 (1942). See generally, 8 McQuillin, Municipal Corporations (3d ed 1957), §§ 25.157-158, pp. 360-366; 2 Rathkopf, Law of Zoning and Planning (3d ed. 1964), c. 57, § 3; Annotation, "Permit or License  Change in Law," 169 A.L.R. 584 (1947).
In the instant matter defendants adduced evidence to support the following alleged expenditures and irrevocable obligations claimed to have been made prior to March 9, 1961:

 Expenditures
January 25, 1960 Taxes ............................... $ 150.00
February 8, 1960 Land Deposit ........................ 7,500.00
April 19, 1960 1/2 FHA Application ................. 1,245.75
April 22, 1960 Tenement Housing Fee ................ 238.00
April 27, 1960 1/2 Architect's Fee ................. 6,080.00
May 10, 1960 Building Permit ..................... 1,500.00
June 15, 1960 Revision of Plans ................... 853.52
August 11, 1960 1/2 FHA Application ................. 1,226.25
August 26, 1960 FHA Inspection ...................... 4,120.00
August 31, 1960 Organizational Expenses ............. 146.50
September 9, 1960 Cash on Closing ..................... 14,250.00
September 9, 1960 Interest Bearing Negotiable Notes ... 53,250.00
October 19, 1960 Surveys ............................. 100.00
October 24, 1960 Taxes ............................... 175.00
October 31, 1960 Borings ............................. 1,000.00
 __________
 Total ....................... $91,835.02
*472 Financial Commitments
Mortgage Co. FHA Processing Fee .................. $ 8,240.00
Mortgage Co. Construction Loan Fee ............... 4,120.00
Trust Co. Construction Loan Fee ............... 8,240.00
Title Co. Mortgage Title Insurance ............ 2,100.00
Stallman Legal Fees .......................... 1,200.00
Botjer Legal Fees .......................... 1,000.00
Architect Balance, Drawings ................... 6,080.00
J.D. Construction Co. Costs, Work on Contract ............. 3,000.00
 __________
 Total ....................... $33,980.00
 __________

Plaintiffs do not contest the fact of the listed payments and commitments but urge that they were not made in reliance upon the building permit and, in any event, they were not irrecoverable if the project had been halted in March 1961. Plainly, such items as taxes should be eliminated; likewise, the cash and notes representing the cost of the real estate. The latter is a pertinent factor only to the extent that the evidence might establish a purchase price in excess of the value of the land burdened with the side line restrictions. We observe that the proofs in that area of the case and also with respect to the alleged recoverability of fees earned and paid were in conflict and inconclusive.
No useful purpose would be served by a detailed discussion of the various items scheduled. Obviously, there were large expenses and commitments which were justified and incurred in good faith.
Although the trial court found "nothing extraordinary" about the itemized expenses and considered defendants' activities not to be demonstrative of reliance "to any substantial degree on the existing permit," we are unable from our study of the record to concur in that view.
We cannot be oblivious to the reality that, preliminary to the mortgage closing of an FHA construction project of the type and magnitude of the one under consideration, extensive *473 services are necessarily involved on the part of the promoters and their professional and business agents, such as lawyers, architects, engineers, brokers and title examiners. In order to conclude such an enterprise successfully, the facts of business life bespeak the need not only for essential disbursements and financial commitments but also a substantial investment in planning, negotiations and time-consuming efforts. Ordinarily such investments, beyond a nominal amount, are not made unless and until a building permit has been obtained or its issuance assured.
According to the evidence, after the building inspector in January 1960 indicated the acceptability of the land owners' tentative proposal, the preliminary planning work progressed to meet the municipal requirements. Subsequent to the issuance of the building permit on May 6, 1960, the promotional negotiations and mesne transfers, culminating in the project ownership by Edenboro and its mortgage financing, were directed toward the eventual construction of the apartment building in accordance with the architect's completed plans and specifications approved by the FHA and predicated upon the building permit which had been issued. Brown and Weiner severed their New York employment relationships in February 1961 in order to promote the Edenboro project and to complete the details preliminary to the settlement which was to produce the funds for construction. The substantiality of the alleged investment in the building permit was not limited to actual monetary disbursements and financial commitments.
Although on March 9, 1961 commencement of the construction work may not have been undertaken, that precise activity is not conditio sine qua non to the establishment of reliance upon a building permit. Progressive efforts in preparing for construction, pursued in good faith, coupled with a continued deepening involvement, positional changes and incidental expenditures and commitments, might well add up to a substantial investment in the permit that in all fairness and justice should be protected as a vested right. Tremarco Corporation *474 v. Garzio, supra, manifests a departure from the formalism theretofore expressed in many holdings under which reliance upon a validly issued permit was generally required to be established by overt acts indicating a change relating to the land itself.
Thus viewed, and considered in the light of the total record, about which more later, we cannot conclude that the building permit in controversy was ipso facto invalid on March 9, 1961. Under the extenuating circumstances here presented, it can be fittingly said, as this court did in Gulf Oil Corp. v. Vogel, 50 N.J. Super. 324, 328 (App. Div. 1958), certification denied 28 N.J. 36 (1958):
"We ought not to be astute to find a forfeiture of rights under a building permit when it appears that the owners have in good faith been proceeding steadily, although slowly, with the project, and have invested substantially in preliminary arrangements."

II.
The Edenboro property is located in an apartment district where the right to build multiple-dwelling, high-rise structures has existed at all times. It is a permitted use type of building and is not a nuisance in itself. From 1922 until the March 1961 zoning amendment, side yards were not essential.
This is not a proceeding by the governing body of the city to restrain, correct or abate a violation of its ordinance within N.J.S.A. 40:55-47, but rather an action initiated by adjoining property owners for that purpose. As individuals, their right to maintain such an action depends upon a showing that they have sustained, by reason of the violation, "special damages over and above the public injury." See Stokes v. Jenkins, 107 N.J. Eq. 318 (Ch. 1930); Yanow v. Seven Oaks Park, Inc., 15 N.J. Super. 73 (Ch. Div. 1951); Morris v. Borough of Haledon, 24 N.J. Super. 171 (App. Div. 1952), reversing 20 N.J. Super. 433 (Ch. Div. 1952); Garrou v. Teaneck Tryon Co., 11 N.J. 294 (1953); cf. *475 Mayor, & Council of Alpine Borough v. Brewster, 7 N.J. 42 (1951). See also Annotation, "Zoning Ordinance  Injunction," 129 A.L.R. 885 (1940).
Although it is argued that plaintiffs sued as taxpayers, citizens and property owners, and that they represented the public at large, we are not persuaded from what is before us that their interest in the pending controversy extends beyond the protection of their individual property rights.
The construction of the apartment house continued during the course of the litigation, and at no time did plaintiffs attempt to obtain an ad interim restraint. It is noteworthy that they promptly sought and obtained an order to enjoin proceedings for a variance which appellants began after the trial court had made known its decision.
It seems abundantly clear from the evidence that the settlement on April 21, 1961 was consummated by the purchasing and financing interests of the project only after the respective parties had been advised and assured that the outstanding building permit had not been vitiated by changes in the new zoning legislation. There was unquestioned reliance upon the municipal building inspector's interpretation of the new ordinance. His letter of March 19, 1961 and the bona fide presettlement efforts to resolve that vital issue before closing are factors that weigh heavily toward rendering the permit relied upon impervious to attack.
In Jantausch v. Borough of Verona, 41 N.J. Super. 89 (1956), affirmed 24 N.J. 326 (1957), Chief Justice (then Judge) Weintraub, speaking for the Law Division, discussed the subject of reliance and the controlling principles "at the extreme poles of the problem." After referring to situations where permits had been regularly issued and relied upon and, on the other hand, to cases where there was no semblance of compliance or reliance, he made the pertinent comment:
"But what of the intermediate situation in which the administrative official in good faith and within the ambit of his duty makes an erroneous and debatable interpretation of the ordinance and the property owner in like good faith relies thereon? The dictum in *476 favor of estoppel contained in Freeman v. Hague, supra (106 N.J.L., at page 140) perhaps falls in this area." (41 N.J. Super., at p. 94)
The trend is toward the application of equitable principles of estoppel where the interests of justice, morality and common fairness clearly dictate. Note, Gruber v. Mayor, etc., of Raritan Tp., 73 N.J. Super. 120 (App. Div. 1962), affirmed 39 N.J. 1 (1962); 405 Monroe Co. v. Asbury Park, 40 N.J. 457 (1963). Accord, East Orange v. Bd. of Water Com'rs, etc., 41 N.J. 6 (1963).
We were advised at oral argument that the apartment building was completely erected and that all but 10 or 11 of its 64 dwelling units were then occupied. The record reveals that during colloquy at the hearing on plaintiffs' motion to settle the form of final judgment, the trial judge mentioned that he had visited the premises and that "it is fairly evident that the only way that that building could be brought into compliance insofar as physical alteration of the building is concerned would be to take down the entire building." Movants' counsel remarked, "I grant you that the cost of compliance is stupendous." Appellants suggested that the court consider, as an alternative to mandatory demolition, a monetary award to plaintiffs and that expert testimony be taken as to the value of plaintiffs' properties with and without the offending side line structure. Furthermore, appellants offered to purchase plaintiffs' properties at prices to be determined by disinterested expert appraisers. Those overtures were opposed and rejected by plaintiffs.
While plaintiffs' proofs established a violation and the proximity of the apartment building to their respective property lines, sufficient to give them "standing" to institute this action, there was no proof that plaintiffs had suffered any "special damages" beyond what might be suffered by anyone owning property next to a building in violation of a zoning ordinance.
For the single purpose of gaining a better understanding of the proofs, this court likewise inspected the subject property *477 and the surrounding neighborhood. Cf. Yahnel v. Bd. of Adjust. of Jamesburg, 79 N.J. Super. 509, 511 (App. Div. 1963), certification denied 41 N.J. 116 (1963). We are convinced that the economic waste which would be entailed in the destruction of such an edifice, valued by the FHA at approximately $850,000, cannot be justified and is an impelling reason for judicial consideration of the consequent relative hardship and the prevailing equities between the parties.
A recent pronouncement of our Supreme Court in the side yard zoning case of Place v. Bd. of Adjust. of Saddle River, 42 N.J. 324 (1964), adds emphasis to the concept that if property owners in the position of appellants are to obtain any relief from the rigors of a side line violation of a zoning ordinance, it must come from the equity jurisdiction of the courts.
Parallel conflicts, dealing with actions by property owners to compel the removal of buildings or parts thereof erected on premises in violation of restrictive covenants, furnish examples of the equitable application of the doctrine of relative hardship. Prior to Gilpin v. Jacob Ellis Realties, Inc., 47 N.J. Super. 26 (App. Div. 1957), there was a considerable body of decisions against invoking the doctrine by way of defense in an injunctive proceeding. An equally impressive line of cases was to the contrary.
In Gilpin, plaintiff sought a mandatory injunction to compel the removal of portions of a building that had been erected in breach of a restrictive covenant. The trial court found that it would cost defendant Ellis $11,500 to relocate its nonconforming building and that a substantial loss in rentals would ensue. It also found that the permanent damages suffered by plaintiff came to $1,000. The injunction was denied and a judgment of $1,000 was entered in plaintiff's favor. Plaintiff appealed and we affirmed. Judge Clapp, in writing this court's opinion, extensively assembled the authorities pro and con, and concluded that the doctrine of relative hardship was supportable as "the more equitable view." Id., *478 at p. 35. See Griggs, "Will New Jersey Courts of Equity Balance Hardship in Nuisance and Encroachment Cases on Final Hearing?" 87 N.J.L.J. 249 (1964). See also the classic statement of Mr. Justice (then Chief Judge) Cardozo in his dissenting opinion in Graf v. Hope Bldg. Corporation, 254 N.Y. 1, 171 N.E. 884, 888, 70 A.L.R. 984 (Ct. App. 1930), "Let the hardship be strong enough, and equity will find a way, though many a formula of inaction may seem to bar the path."
An injunction is the strong arm of equity, and it is a fundamental rule that such a remedy
"should never be granted when it will operate oppressively or contrary to the real justice of the case, or where it is not the fit and appropriate method of redress under all the circumstances of the case, or when the benefit it will do the complainant is slight in comparison with the injury it will do the defendant. The great office of the writ is to protect and preserve, not to destroy." Sternberg v. O'Brien, 48 N.J. Eq. 370, 376 (Ch. 1891).
We are satisfied that the judgment under review imposes a disproportionate and unconscionable hardship upon defendants and that the equities viewed from the total record do not preponderate in favor of plaintiffs.
Judgment reversed and the case remanded for the entry of judgment in favor of defendants. No costs.