628 A.2d 321

PALATINE I, A PARTNERSHIP, PLAINTIFF–APPELLANT,
v. PLANNING BOARD OF THE TOWNSHIP OF
MONTVILLE, DEFENDANT–RESPONDENT.

Argued March 29, 1993—Decided August 5, 1993.

*Bennett M. Stern* argued the cause for appellant (*Stern, Lavinthal, Norgaard & Daly,* attorneys).

*Joel A. Murphy* argued the cause for respondent (*Murphy and Kurnos,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents the question of whether a municipal planning board's grant of preliminary site-plan approval and a building permit insulates a developer in perpetuity against zoning changes. Specifically, is a municipal planning board equitably estopped from denying final site-plan approval and applying post-preliminary site-plan approval zoning amendments to a developer whose preliminary site-plan approval and construction permit have expired? Like the trial court and Appellate Division below, we conclude that it is not. Accordingly, we affirm the judgment of the Appellate Division.

## I. *Facts and Procedural History*

Plaintiff, Palatine I (Palatine), is a partnership owning 4.9 acres of land in Montville. In 1982, Palatine applied to the Montville Planning Board (the Board) for preliminary site-plan approval for an office building. The application proposed a 65,000–square–foot two-story building, consisting of two 30,000–square–foot wings connected by a central core. On February 11, 1982, the Board, finding that the application fully complied with all then-existing zoning regulations, granted preliminary site-plan approval. That initial grant of preliminary site-plan approval conferred rights on Palatine for a three year period, ending February 11, 1985. In October 1984, Palatine applied for and received an extension of the preliminary site-plan approval to February 11, 1986. In January 1986, Palatine applied for and received a second extension to February 12, 1987. In granting the second extension, the Board warned Palatine that "this is the last extension of preliminary site plan you can request."

During the period covered by the second extension, Palatine applied for a construction permit. The permit was issued by Montville's construction official on April 11, 1986. Palatine paid fees of $4,699.31 for the construction permit. Printed across the bottom of the permit was the following notice:

If construction does not commence within one (1) year of date of issuance, or if construction ceases for a period of six (6) months, this permit is void.

Palatine did commence construction and completed the first wing of the building (Section I) and the central core sometime in 1987 or 1988. Palatine also laid a concrete slab as a foundation for the second wing (Section II), but did not construct the remainder of Section II because of "the sagging real-estate market." At that stage, Palatine had spent approximately $2,000,000 for construction costs, including $200,000 for a storm sewerage permit and $40,000 for soil improvement. No allocation has been made of the construction costs attributable solely to the construction of Section II. Palatine still has no plans to build Section II in the foreseeable future.

In October 1989, Palatine, having secured tenants for Section I, applied for a certificate of occupancy for that Section and for final site-plan approval for the entire complex. In 1986 and 1987, after the granting of the preliminary site-plan approval, Montville had amended its zoning ordinances in ways that made them more restrictive than the zoning ordinances in effect at the time of the original approval. Under the new standards, the largest building that could be built on Palatine's property would be approximately 45,000 square feet. Palatine had already built one 30,000–square-foot wing plus the small core. Roughly speaking, therefore, the net effect of the maximum lot coverage standard, if applied to Palatine, would be that Palatine would have to halve the size of the unbuilt wing or else obtain variances.

In considering Palatine's application for final site-plan approval, the Board bifurcated its consideration of Section I and the core, which existed, and Section II, which did not. The Board's resolution stated:

this application was originally submitted in 1981 and the first building has been completed while only a foundation exists for the second building, and the Board notes that no work has progressed on the second building for a period of years. Applicant now wants to rent the first building but preserve his rights under the original Ordinance for the construction of Phase II, the second building; and

 * * * * * * * *

the applicant testified that completion of the original project was held up because of economics; and

 * * * * * * * *

the Board, based on legal advice, finds that while the first building was in compliance with the 1981 Land Use Ordinance, that building number 2 when completed, must comply with the Ordinance in affect [sic] at the time a new site plan application is approved; and

 * * * * * * * *

the Board finds that the application should be bifurcated and approval given only to the first building * * *.

Accordingly, the Board granted final site-plan approval and a certificate of occupancy for the existing structure consisting of Section I and the core. However, the Board denied final site-plan

approval for Section II because the plans did not comply with current zoning regulations.

Palatine filed a complaint in lieu of prerogative writ in the Law Division on December 19, 1990, naming the Board as the sole defendant. Palatine sought declaratory judgment that it was entitled to final site-plan approval on the entire project and that it could, "at such time as it sees fit," complete construction of Section II as originally approved under 1982 zoning law. Palatine presented two arguments. The first was that the Board was arbitrary, capricious, and unreasonable and acted contrary to law in concluding "that * * * preliminary site plan approval on building number 2 had expired; and/or * * * [t]hat Palatine is subject to zoning amendments rendering the Building nonconforming after the commencement of construction." The second theory was that due to Palatine's reliance on the building permit, the Board was equitably estopped from enforcing against Palatine any zoning amendments adopted after construction began. The Board counterclaimed for declaratory relief, arguing that it had acted within its rights in denying final approval. The parties entered into a stipulation of facts.

After oral argument, the trial court affirmed the Board's decision to deny Palatine final site-plan approval for Section II and to subject plaintiff to the zoning regulations enacted after the grant of preliminary approval. The trial court stated, however, that a "plausible case might well be made by the plaintiff for getting a variance" from the Montville Board of Adjustment.

Plaintiff appealed, adding as a third theory that the entire proposed building, including both Section I and the unbuilt Section II, was protected as a pre-existing nonconforming structure under *N.J.S.A.* 40:55D–68. The Appellate Division rejected all Palatine's arguments and affirmed the trial court's judgment substantially for the reasons expressed in its opinion.

We granted certification, 130 *N.J.* 601, 617 *A.*2d 1223 (1992), and now affirm.

## II. *Protection Under Preliminary Site–Plan Approval*

A municipality is empowered by *N.J.S.A.* 40:55D–37 to enact an ordinance requiring approval of site plans by the municipal planning board as a condition for issuance of a construction permit. Montville has such an ordinance. Accordingly, Palatine submitted its plans for its proposed office building in 1981 and received preliminary site-plan approval on February 11, 1982.

■ A grant of preliminary site-plan approval carries with it certain rights. *N.J.S.A.* 40:55D–49 provides that preliminary approval protects the applicant from changes in zoning ordinances for three years, except for zoning changes that "relate to public health and safety." That statute also states that "the applicant may apply for and the planning board may grant extensions on such preliminary approval for additional periods of at least 1 year but not to exceed a total extension of 2 years, provided that if the design standards have been revised by ordinance, such revised standards may govern." The purpose of the statute is to give a developer a reasonable period of protection from changes in the zoning law. *Bleznak v. Township of Evesham*, 170 *N.J.Super.* 216, 219, 406 *A.*2d 201 (Law Div.1979).

Thus, an applicant who receives preliminary site-plan approval for a project is protected under *N.J.S.A.* 40:55D–49 against the application of adverse zoning amendments unrelated to public health or safety for up to five years from the grant of preliminary site-plan approval. After those five years have elapsed, the preliminary approval does not automatically expire, but the statutory period of protection from adverse changes in zoning regulation does expire.

On the closely related subject of final site-plan approval, William Cox writes:

There is a common misapprehension that a site plan "expires" at the end of the two-year period set forth in *N.J.S.* 40:55D–52a. The statute does not so provide; the site plan is given protection, or vested rights, against a change in zoning for said period, but *if at the expiration of the two years there has been no change in zoning,* the site plan continues to be in full force and effect until such time as the developer determines to proceed with the development.

[William M. Cox, *New Jersey Zoning and Land Use Administration* ¶ 15:5.2 (1993) (emphasis added).]

If, however, there has been a change in the zoning, then the final site-plan approval will not insulate the site plan from the application of the new zoning laws after the two-year period of protection expires.

■ The same is true of preliminary approval, except of course that the statutory term of years is different. The approval itself is valid indefinitely, but its effect of insulating the holder from changes in the zoning laws is limited to the specified term of years. If the applicable zoning laws have not changed, the holder of preliminary approval may continue past the five-year period without obtaining further approvals. However, if the zoning laws have changed, then after the five-year period of protection has elapsed, the municipality may enforce those new regulations against the holder of preliminary approval.

Thus, Palatine's preliminary approval protected it from non-safety-related changes in the zoning laws for a five-year period. That protection began on February 11, 1982, and ended on February 11, 1987. By the time Palatine applied for final site-plan approval in October 1989, it was no longer protected by the preliminary site-plan approval from changes in the applicable zoning laws.

## III. *Building Permit*

While it was still under the preliminary site-plan approval's protection, Palatine applied for a building permit. Montville's zoning ordinances allow a developer to obtain a building permit before obtaining final site-plan approval. The relevant ordinance states:

A construction permit in connection with a site plan may be issued following preliminary approval and prior to final approval * * *.

[Montville Code § 150–78(B).]

Although it may be, as the trial court stated, "the better practice" for a municipality to require final site-plan approval before issuing

a site plan, the Municipal Land Use Law (MLUL) does not clearly mandate that practice. Cox states that "[t]here can be no commencement of construction and, in fact, no issuance of a building permit until final approval of a site plan has been obtained," Cox, *supra*, ¶ 15–5.2, but he cites no case or statute in support of that unequivocal assertion. The relevant statute states:

> The governing body may by ordinance require approval of subdivision plats by resolution of the planning board as a condition for the filing of such plats with the county recording officer and approval of site plans by resolution of the planning board as a condition for the issuance of a permit for any development * * *.

[*N.J.S.A.* 40:55D–37(a).]

The authorizing statute does not distinguish between preliminary and final site-plan approval, nor does it distinguish between preliminary and final subdivision approval, thus leaving unclear which form of approval may be required before a building permit may issue. Case law has answered that question with regard to subdivisions, holding that final subdivision approval is required before a building permit may be issued. *Levin v. Township of Livingston*, 35 *N.J.* 500, 512–13, 173 *A.*2d 391 (1961); *Cella v. Township of Cedar Grove Bd. of Adjustment*, 45 *N.J.Super.* 585, 589, 133 *A.*2d 389 (Law Div.1957). However, no case has construed the statute with regard to site-plan approval. Montville's ordinance reflects that distinction, requiring final approval before issuance of a building permit for a subdivision, Montville Code § 150–78(A), but requiring only preliminary approval for a site plan, Montville Code § 150–78(B).

The question of whether *N.J.S.A.* 40:55D–37 refers to final site-plan approval rather than preliminary site-plan approval as a condition for the issuance of a permit is not before us. Palatine does not challenge the validity of the ordinance. Although the Board did argue below that the ordinance was invalid because it improperly allowed issuance of a building permit before final site-plan approval, it did not seek certification of that question.

■ Moreover, even if the ordinance were invalid, that circumstance would be irrelevant to the disposition of this case. When a

permit is issued in good faith and in apparent compliance with the law, and the permit-holder reasonably and in good faith relies on that permit, the issuing municipality is estopped from revoking it even if it was erroneously issued. *Jantausch v. Borough of Verona*, 41 *N.J.Super.* 89, 124 *A.*2d 14 (Law Div.1956); *see also Gruber v. Mayor of Raritan Township*, 39 *N.J.* 1, 186 *A.*2d 489 (1962) (noting distinction between "an act which is utterly beyond the jurisdiction of a municipality and an act which involves an irregular exercise of a basic power possessed by the municipality," stating in latter case municipality may be equitably estopped from revoking irregularly-issued permit after reliance). Essentially, such a permit is treated as validly issued. The permit in this case was issued in good faith and relied upon by Palatine. Therefore, we treat the permit as validly issued regardless of the ordinance's validity. Palatine received its building permit on April 11, 1986, within the five-year period of protection from adverse zoning changes afforded by the preliminary site-plan approval. The permit bore the following words on its face:

Note: If construction does not commence within one (1) year of date of issuance, *or if construction ceases for a period of six (6) months, this permit is void.* (emphasis added).

Palatine began construction and completed Section I and the core of the building, and also laid a concrete slab as a foundation for Section II. At that point, sometime in 1988, Palatine halted construction, anticipating a shortage of tenants due to a downturn in the real-estate market. Neither the Board nor any town entity influenced Palatine's decision to halt construction; it was a unilateral decision based on economics. Palatine has never attempted to resume construction nor does it have any plans to do so in the foreseeable future. Construction having ceased for more than six months, the permit was void on its face long before the Board denied final site-plan approval or Palatine filed this suit.

Palatine argues, however, that the permit still entitles it to build Section II whenever it chooses without having to comply with any zoning changes enacted after the 1982 preliminary site-plan approval. Palatine's argument in support of its position really

consists of two discrete arguments. Its primary argument is that due to Palatine's reliance on the permit and the preliminary site-plan approval, the Board is equitably estopped from revoking or from refusing to reissue a building permit. That argument is discussed in Part IV of this opinion. Its second, subsidiary argument is that the words on the face of the permit, despite their apparently plain meaning, do not operate to void the permit after a six month halt in construction.

■ The time limitation on the face of the permit is based on the New Jersey Uniform Construction Code (the Code). The Code, codified at Title 5, Chapter 23 of the *New Jersey Administrative Code,* was adopted by the Commissioner of the Department of Community Affairs pursuant to the Legislature's command that he "adopt a State Uniform Construction Code." *N.J.S.A.* 52:27D-123. The Commissioner was given "all powers necessary or convenient to effectuate the purposes of this act, including [the power] * * * [t]o adopt, amend and repeal * * * rules relating to the administration and enforcement of this act" and to "make, establish and amend * * * such rules as may be necessary, desirable or proper to carry out his powers and duties under this act." *N.J.S.A.* 52:27D-124.

Section 5:23-2.16 of the Code governs construction permits. In relevant part, it states:

(b) Suspension of permit: Any permit issued shall become invalid if the authorized work is not commenced within 12 months after issuance of the permit, or if the authorized work is suspended or abandoned for a period of six months after the time of commencing the work.

[*N.J.A.C.* 5:23-2.16.]

Palatine does not argue that *N.J.A.C.* 5:23-2.16(b) is arbitrary and capricious or beyond the scope of the Commissioner's authority to adopt. It argues that the regulation does not mean what it says. According to Palatine, *N.J.A.C.* 5:23-2.16(b)'s sole intent was to allow a municipality to require a builder who suspended construction to comply, on resuming construction, with changes in the safety-related model subcodes promulgated by the Building

Officials and Code Administrators International, Inc. (BOCA). Palatine argues that the regulation was not intended to allow a municipality to require a builder to comply with changes in zoning ordinances. Palatine bases those assertions on an alleged conversation with the former Commissioner who drafted the regulations.

We are unimpressed by Palatine's unofficial legislative history. Whatever may have been the Commissioner's motivation, the regulation he wrote is clear, and it is the regulation that governs, not a second-hand report of the intent of its author expressed years after its promulgation.

Moreover, the plain language of the regulation is totally at odds with Palatine's proffered interpretation. The regulation simply states that if construction is suspended or abandoned for six months, the permit becomes invalid. We will not read extrinsic provisions into that unambiguous command.

Palatine appears to be confusing the issuance of a building permit by the municipality's construction official with the granting of preliminary or final site-plan approval by the planning board. Site-plan approvals carry with them an umbrella of statutory protection from changes in non-safety-related regulations. Building permits do not carry the same degree of protection; they give the builder permission to build and confer rights against inequitable government action. It is the site-plan approval, not the permit, that when validly issued insulates the builder from non-safety-related changes in applicable regulations. If the building permit expires during the statutory period of protection provided by the site-plan approval, then the builder is protected by the site-plan approval. If the building permit expires and there is no extant site-plan approval, nothing protects the builder. The permit does not itself provide protection from changes in the law.

We therefore conclude that *N.J.A.C.* 5:23–2.16(b) validly provides that a building permit is void after six months of suspension of construction. Palatine freely decided to halt construction for over six months. Therefore, its permit has expired and its permission to build has terminated.

## IV. *Equitable Estoppel*

■ Palatine's main argument is that the Board is equitably estopped from applying zoning amendments enacted after 1982 against Palatine. Palatine argues that the preliminary site-plan approval protected it from 1982 to 1987; that a building permit was validly issued during that period of protection; and that it relied on that building permit by commencing construction. Therefore, Palatine claims, even if the building permit has expired, the Board is equitably estopped from "revoking" the permit.

We note first that the Board does not issue the building permit. That power lies in the construction official of Montville. Neither the construction official nor Montville was joined in this suit. Further, we note that the Board has not revoked Palatine's permit; the permit expired on its own terms due to Palatine's inaction. However, the Board denied final site-plan approval for Section I, and has stated that it would not approve a new application for preliminary site-plan approval for Section II unless the application complied with all zoning ordinances in effect at the time it is made. Without the Board's grant of preliminary or final site-plan approval, Palatine cannot obtain a new building permit from the construction official. Palatine believes that it does not need to reapply for preliminary site-plan approval. Its position is that its reliance on the original building permit entitles it to complete the original project at its convenience, and that Montville is estopped from requiring any further approvals or enforcing any adverse zoning amendments enacted after the preliminary site-plan approval in 1982.

We have applied the doctrine of equitable estoppel in a number of cases between builders and municipalities, although never in a case factually analogous to this one. We have held that when a permit is issued validly or in good faith and the builder has justifiably and in good faith relied on it to his substantial detriment, the municipality is estopped from revoking the permit absent fraud. When the permit was invalidly issued without even a semblance of compliance with the relevant ordinances, however,

estoppel will not apply even if there has been reliance. *Gruber, supra,* 39 *N.J.* at 14–15, 186 A.2d 489; *Jantausch, supra,* 41 *N.J.Super.* at 93–94, 124 A.2d 14.

 The doctrine of equitable estoppel is applied "only in very compelling circumstances," *Timber Properties, Inc. v. Chester Township,* 205 *N.J.Super.* 273, 278, 500 A.2d 757 (Law Div. 1984), "where the interests of justice, morality and common fairness clearly dictate that course." *Gruber, supra,* 39 *N.J.* at 13, 186 A.2d 489. The purpose of the doctrine is to balance fairly the developer's interest in a stable and predictable regulatory climate with the municipality's interest in promoting sound planning and growth.

> [T]he ultimate objective [is] fairness to both the public and the individual property owner and * * * it [is] necessary to strike a proper balance between the interests of the plaintiff and the right and duty of the municipality to promote the public welfare of the community through proper planning and zoning.

> [*Gruber, supra,* 39 *N.J.* at 15, 186 A.2d 489.]

With those equitable principles in mind, we have applied equitable estoppel to prevent municipalities from revoking valid permits or approvals from builders who had justifiably relied on those permits or approvals to their substantial detriment. In *Gruber,* we held that the township, which was "seeking to disavow its commitments to a developer with whom it [had] not dealt at all fairly," was estopped from rezoning plaintiffs' land to exclude residential uses after plaintiffs had invested substantial resources and had actually constructed several houses. *Id.* at 18, 186 A.2d 489. In *Tremarco Corporation v. Garzio,* 32 *N.J.* 448, 161 A.2d 241 (1960), the plaintiff held a valid permit to build a gas station on its property and had undertaken considerable preconstruction work, including entering into a construction contract. The township revoked the permit and passed an ordinance banning gas stations in that neighborhood. We held that the township was estopped from revoking the permit and retroactively applying the no-gas-stations ordinance after the plaintiff's reliance. *Id.* at 458, 161 A.2d 241.

The present case is unlike *Gruber* or *Tremarco*. In those cases, the townships had attempted to interfere and to revoke rights that were validly held by the builders at the time of the attempted revocation. We held that equitable estoppel barred that interference with the builders' rights. By contrast, at the time the Board denied Palatine's application for final site-plan approval on Section II, Palatine's building permit and the statutory period of protection from changes in the law had both expired. Palatine at that point possessed no right to continue building without complying with up-to-date zoning regulations. The Board, therefore, did not violate, deny, or revoke Palatine's rights by denying final site-plan approval as to the unbuilt portion of the building, and therefore equity does not require that the Board be held to be estopped.

Palatine's case is more analogous to the situation in *Dimitrov v. Carlson*, 138 *N.J.Super.* 52, 350 *A.*2d 246 (App.Div.1975). In that case, the developer obtained a use variance in 1964 enabling him to build 196 garden apartments on his property. The variance had no time limitation. In 1966, the municipality amended the zoning ordinance, banning garden apartments from all zones. In 1970, the developer submitted an application for site-plan approval, proposing to build the garden apartments. The planning board denied the application because it violated the 1966 ordinance. The developer brought suit, arguing, among other things, that he had spent money in reliance on the variance and that the planning board was therefore estopped to deny approval of the site plan because of the change in the ordinance.

The Appellate Division rejected the developer's claim for equitable relief, holding instead that equitable principles compelled an affirmation of the board's decision.

[R]espondents waited six years after obtaining their use variance, and four years after the erection of garden apartments was proscribed, before seeking site plan approval.

Such long delays, whatever financial or other problems respondents may have had, do not warrant equitable relief.

[138 *N.J.Super.* at 60–61, 350 *A.2d* 246.]

The Appellate Division's opinion in *Dimitrov* recognizes that the equities are not all on one side: the developer has an interest in preserving the conditions under which he initially decided to invest in the development, but the township also has an interest in enforcing its laws and controlling its growth and development. Palatine, like Dimitrov, asks us to hold its interests as absolutely protected for an unlimited period of time and to hold the municipality's interests as negligible, and to do that in the name of equity. We cannot.

██ Site-plan approval statutes, by setting forth a period of years in which site plans are protected from adverse zoning changes, strike an equitable balance between the interests of developers in stable regulations and the interests of municipalities in being able to plan for their communities through zoning ordinances and in being able to enforce those ordinances. We see no special facts in this case that warrant disturbing the balance between those interests chosen by the Legislature. Palatine's interests in a stable regulatory environment were amply protected by the five-year period of protection it received under the preliminary site-plan approval. It chose not to begin construction until over four of those five years had elapsed. It chose not to apply for final site-plan approval, which would have given it another two to five years of protection, during that five-year period. Indeed, like Dimitrov, Palatine

> without good cause, slept upon [its] rights and should not now be heard to complain. The effect of [Palatine] prevailing on this appeal would be to limit and frustrate the township's right, power and duty, in factual situations as exist here, to adopt future zoning laws for the public welfare and safety * * *.
>
> [*Dimitrov, supra,* 138 *N.J.Super.* at 61, 350 *A.2d* 246.]

Palatine's self-caused hardship does not warrant equitable relief.

██ The burden of proving a claim of equitable estoppel rests on plaintiff. *Virginia Constr. Corp. v. Fairman,* 39 *N.J.* 61, 70, 187 *A.2d* 1 (1962). Plaintiff has failed to present such evidence. Palatine does not allege that either the Montville construction official or the Board acted in bad faith. Palatine did not rely on

any representation by the Board or the municipality that its protection from adverse zoning amendments would continue beyond the expiration of the preliminary site-plan approval. The Board was accommodating to Palatine. It granted Palatine every legal extension of preliminary approval that it requested, noting in the second extension that that was the last extension on the preliminary site plan that could be requested; approved the building permit; gave it a certificate of occupancy for Section I so it could rent that Section; and did nothing to halt construction of Section II. Unlike the municipalities in *Gruber* and *Tremarco*, Montville did not attempt to revoke a valid permit, to interfere with construction, or to disavow commitments to Palatine. It was Palatine's decision not to build Section II or to seek a timely final site-plan approval.

Furthermore, the record does not provide any showing of Palatine's expenditures made solely for Section II or an analysis of the economic loss Palatine might sustain from building a smaller Section II. Because Palatine has no plans to resume construction of Section II at this time, any losses he may suffer when he finally, if ever, does decide to construct Section II are highly speculative. *See Virginia Constr. Corp., supra,* 39 *N.J.* at 71, 187 *A.*2d 1 (holding that potential loss of some anticipated profits is not controlling factor).

Moreover, even if Palatine had been able to prove substantial detrimental reliance, we would still not find estoppel because only *justified* and *reasonable* reliance warrant the application of equitable estoppel. Palatine's reliance was neither. The Board's final extension of preliminary site-plan approval clearly stated that the approval expired on February 12, 1987. Palatine knew, or should have known, that its statutory insulation from changes in the law expired on that date. Likewise, the building permit clearly stated that it expired after six months' suspension or abandonment of construction. Palatine knew, or should have known, that its right to build under that permit would expire after it had halted construction for six months. Palatine could not reasonably have believed that these authorizations went on forev-

er, when they so clearly announced the terms of their expiration. Indeed, under these facts "[i]t would disturbingly conflict with the public interest to tie [Montville] to past ideas during that extended time in the future." *Virginia Constr. Corp., supra,* 39 *N.J.* at 73, 187 *A.*2d 1. No perpetual legal protection existed on which Palatine could justifiably rely. Therefore, Palatine's alleged detrimental reliance on the perpetual validity of a preliminary site-plan approval and a building permit with definite terms of expiration was unreasonable and unjustified and does not warrant the application of equitable estoppel.

We agree with the dissent that this is an unusual case. A developer with no definite plans to build in the foreseeable future is asserting that the municipality's zoning ordinance in effect when it secured preliminary site-plan approval is frozen, so that regardless of when, if ever, it resumes construction, those 1982 zoning ordinances would be applicable. The developer asserts that even though the protection afforded by preliminary site-plan approval is limited in time, and even though the protection afforded by a building permit is contingent on continued progress, it is protected forever from adverse zoning amendments because it relied on the approval and permit while they were valid. Given the extraordinary nature of Palatine's claims, it is not surprising that there is no precedent on point.

Nonetheless, that a case is novel does not make it meritorious. A remand for factual findings on the extent of Palatine's reliance would be appropriate only if reliance, if proven, could warrant the application of equitable estoppel. Under the facts of this case, no amount of reliance could change the fact that for Palatine to act in reliance on its belief that its preliminary site-plan approval and its building permit would protect Palatine from zoning changes forever was unreasonable.

V. *Nonconforming Structure*

Palatine urges that the entire building, both the existing and operating Section I and the unbuilt Section II, is protected from adverse zoning changes as a pre-existing nonconforming structure.

*N.J.S.A.* 40:55D–68 provides that "[a]ny nonconforming use or structure *existing at the time of the passage of an ordinance* may be continued upon the lot or in the structure so occupied * * *." (emphasis added). The purpose of the statute is to balance the municipality's interest in being able to amend its zoning ordinances with the property owner's interest in maintaining the use and value of his or her property. Thus, the statute protects structures and uses that are already in existence at the time of the amendment, but it does not protect nonconforming structures or uses that do not yet exist and are merely planned or intended. The policy of the law is to restrict, rather than to expand, nonconforming uses; although they may be continued, they may not be enlarged or extended. *Hay v. Board of Adjustment,* 37 *N.J.Super.* 461, 464, 117 *A.*2d 650 (App.Div.1955).

The nonconforming uses and structures statute protects *existing* structures from changes in ordinances that render them nonconforming. That protection is permanent unless the nonconformity is abandoned by the owner. The statutes governing preliminary and final site-plan approval protect *proposed* structures from changes in zoning ordinances that render them nonconforming. That protection is limited in time by statute.

At the time of the zoning changes, at the time of the application for final site-plan approval, and at present, Section II was and is a proposed structure. However, because Palatine's protection under the preliminary site-plan approval statute has expired, Palatine now seeks to extend the protection afforded by the nonconforming uses and structures statute to nonexistent structures. We reject that argument. To allow a planned structure to qualify as a nonconforming structure before it is built would be contrary to the sound policy prohibiting enlargement or extension of nonconforming structures and uses. Moreover, extension of the nonconforming structure statute to structures in the planning stage is not necessary to protect the interests of developers. Developers' interests are adequately protected by the statu-

tory period of protection from zoning changes afforded by preliminary and final site-plan approval.

We find that Palatine's building does not qualify as a preexisting nonconforming structure because it did not exist at the time of the passage of the relevant ordinances. We need not consider Palatine's argument that it never abandoned its right to continue its nonconformity, because we find that a statutorily protected nonconformity never existed.

VI. *Conclusion*

For the foregoing reasons, the judgment of the Appellate Division is affirmed.

Chief Justice WILENTZ and Justices HANDLER and POLLOCK join in this opinion.

Justice STEIN has filed a separate dissenting opinion in which Justices CLIFFORD and O'HERN join.

STEIN, J., dissenting.

On first reading, the rough justice that the majority's disposition inflicts on the developer in this case may be viewed as balanced under the circumstances. The Court holds that Palatine I (Palatine), a developer who stopped construction for about two years after completing half of a 60,000 square-foot office building, must comply with recent amendments to the municipal zoning ordinance in order to obtain permission to complete construction of the building. Compliance with those amendments requires that the building's size be reduced by approximately 15,000 square feet.

Under closer scrutiny, however, the Court's approach to this unique set of facts is as one-sided as the developer's. Palatine's position in the lower courts and before us was that the issuance of a building permit combined with substantial construction on the project estopped the municipality *in perpetuity* from applying zoning-ordinance amendments to the unfinished portion of the building, no matter how long the building's completion was de-

layed. The Planning Board viewed the estoppel issue as irrelevant to its obligation to deny final site-plan approval because the plans no longer conformed to the zoning ordinance, suggesting that resolution of the estoppel issue would require joinder of the municipality. The Court's disposition apparently precludes an estoppel against Montville, no matter how compelling the evidence of reliance and prejudice, on the ground that expiration of the building permit and of the statutory protection incidental to preliminary site-plan approval automatically reinstates Montville's power to subject the project to zoning-ordinance amendments. *Ante* at 563, 628 *A.*2d at 330.

In my view, neither Palatine's nor the Court's position is consistent with established principles of equitable estoppel. A disposition faithful to those principles would be based on evidence of reliance and prejudice sufficient to permit a court to apply the estoppel doctrine in order fairly to balance the competing interests of the parties. Although the parties did not adduce estoppel-type evidence before the trial court, incorrectly assuming that their respective arguments would prevail as a matter of law, the preferred disposition would be to remand the matter for the development of such a record, particularly in view of the uniqueness of the issue presented.

I

Some of the critical aspects of the case, either overlooked or underemphasized by the Court, are the following:

1. The factual context is virtually without precedent. As the Law Division judge observed, "I don't think we really have any fully controlling cases because the factual situation here is so unusual. I've never seen anything like it. Or close to it." No reported New Jersey decision has upheld the application of a mid-construction zoning amendment to the uncompleted portion of a structure on which construction substantially had been undertaken before the amendment was adopted. No published opinion has ever decided whether, and under what circumstances, delay in

construction of a partially-completed building can subject the unfinished portion to more-restrictive zoning-ordinance amendments. The absence of such decisional authority testifies persuasively to the generalized acceptance and stability of the basic principle that projects substantially under construction are insulated against subsequent zoning changes, both by statute and under principles of estoppel.

2. Although the Montville Planning Board's final site-plan resolution recites the Board's finding that "the application should be bifurcated and approval given only to the first building," the resolution's implication that the project involved two buildings is inconsistent with the stipulated facts. The parties have stipulated "[t]hat what was approved by the Planning Board constituted *one office building* having two wings each [sic] approximating 30,000 square feet in size, connected by a central core." (Emphasis added)..

3. Although the majority acknowledges the possible invalidity of the Montville ordinance provision that authorized issuance of a building permit to Palatine before final site-plan approval had been obtained, the majority dismissively concludes that that invalidity is irrelevant to the Court's disposition. *Ante* at 556, 628 *A.*2d at 326. Not so. Had the Montville ordinance—the invalidity of which was conceded by the Planning Board in its Appellate Division brief—required final site-plan approval before issuance of a building permit, Palatine would have known in advance the extent of the statutory protection against zoning changes acquired as an attribute of final site-plan approval. See *N.J.S.A.* 40:55D-52a. Because Montville improperly issued Palatine a building permit before final site-plan approval, Palatine lost the benefit of the protection against future zoning changes incidental to final approval. Thus, Montville bears some—but not all—of the responsibility for this zoning debacle.

4. The majority accurately observes that "the record does not provide any showing of Palatine's expenditures made solely for Section II or an analysis of the economic loss Palatine might

sustain from building a smaller Section II." *Ante* at 563, 628 *A.*2d at 330. That omission from the record, the majority apparently concludes, obviates any consideration of whether equitable estoppel should be invoked against Montville. What the majority has overlooked, however, is that neither the parties, nor the trial court for that matter, perceived the need for the introduction of estoppel-type evidence demonstrating the consequences of applying the zoning amendments to this project. As noted, Palatine's contention was that *issuance* of the building permit and substantial construction on the project *permanently* estopped the municipality from applying zoning-ordinance amendments to its building, which it could complete whenever it deemed economic conditions to be suitable; the Planning Board considered the estoppel issue to be between Palatine and the municipality, conceiving its duty to be discharged by denying final site-plan approval to a project that did not comply with recent zoning-ordinance amendments.

The majority correctly notes that the effect of the zoning amendments is to reduce the size of the uncompleted wing of the building by fifty percent, from 30,000 square feet to 15,000 square feet. *Ante* at 323–324, 628 *A.*2d at 550–551. As the municipal engineer's notes make clear, that reduction in the size of the unfinished wing of the building would be required by virtue of Montville's ordinance amendment restricting impervious coverage of the site to fifty-five percent of its area, no such restriction on impervious coverage having been imposed by the ordinance in effect when preliminary site-plan approval was obtained; construction of the proposed 60,000 square-foot building would have resulted in impervious coverage of approximately sixty-three percent of the site. Had the need for estoppel-type evidence been anticipated by the parties, the record presumably would have included testimony concerning the prejudicial effect of the ordinance amendments on the project, such as:

1. aggregate cost of the project, including land acquisition, design and approval costs, and construction costs;

2. architectural and related costs of redesigning project to comply with ordi-' nance amendments;

3. construction costs required and incurred based on 60,000 square-foot plans that would be unnecessary for 45,000–square–foot building;

4. reduction in aggregate construction cost and aggregate rent roll resulting from 15,000–square–foot reduction in size of building;

5. effect of downsizing building on financing arrangements and on developer's anticipated return on investment;

6. effect of 15,000–square–foot downsizing on appearance and value of building;

7. negative impact on municipality and on adjacent properties if zoning-ordinance amendments relating to impervious coverage and floor-area ratio were not applied to Palatine's project.

The foregoing constitute examples of the type of testimony that should have been adduced at trial, to inform an evaluation of the competing equities essential to a proper application of the estoppel doctrine. In that connection, the Township of Montville is a necessary party to any adjudication that might implicate the enforceability of provisions of its zoning ordinance. *See Rule* 4:28–1(a).

II

An examination of two interrelated legal issues is essential to a fair disposition of this appeal. The first concerns the invalidity of the provision of the Montville ordinance authorizing issuance of a building permit *prior* to final site-plan approval. The second concerns the proper application of the equitable-estoppel doctrine.

A. The Montville Ordinance.

In accordance with *N.J.S.A.* 40:55D–49,. Palatine obtained preliminary approval of its site plan in February 1982, affording it protection from zoning changes unrelated to public health and safety for a period of three years. As authorized by the statute, Palatine's protection was extended for two additional one-year periods. See *N.J.S.A.* 40:55D–49c. In April 1986, during the last one-year extension of the protection from zoning changes afforded by its preliminary site-plan approval, Palatine applied to the Township of Montville for a building permit without applying for final site-plan approval, relying on the provision of the Montville

Township ordinance that states: "A construction permit in connection with a site plan may be issued following preliminary approval and prior to final approval * * *." *Montville Code, Land Use Regs.*, § 150–78(B). Although the majority acknowledges that "the better practice" may be for a municipality "to require final site plan approval before issuing a site plan," the majority concludes that "it is not clear that the Municipal Land Use Law (MLUL) mandates that practice." *Ante* at 554, 628 *A.*2d at 326. I have no doubt that the Municipal Land Use Law (MLUL) contemplates that final approval of a site plan is a prerequisite to the issuance of the building permit and that the Montville ordinance is inconsistent with the MLUL.

The relevant statutes provide as follows:

The governing body may by ordinance require approval of * * * site plans by resolution of the planning board as a condition for the issuance of a permit for any development * * *.

[*N.J.S.A.* 40:55D–37.]

\* \* \* \* \* \* \* \*

Preliminary approval of * * * a site plan pursuant to [*N.J.S.A.* 40:55D–46] shall * * * confer upon the applicant the following rights for a 3–year period from the date on which the resolution of preliminary approval is adopted:

 a. That the general terms and conditions on which preliminary approval was granted shall not be changed, including but not limited to use requirements; layout and design standards for streets, curbs and sidewalks; lot size; yard dimensions and off-tract improvements; and, in the case of a site plan, any requirements peculiar to site plan approval pursuant to [*N.J.S.A.* 40:55D–41]; except that nothing herein shall be construed to prevent the municipality from modifying by ordinance such general terms and conditions of preliminary approval as relate to public health and safety;

 b. That the applicant may submit for final approval on or before the expiration date of preliminary approval the whole or a section or sections of the preliminary subdivision plat or site plan, as the case may be; and

 c. That the applicant may apply for and the planning board may grant extensions on such preliminary approval for additional periods of at least 1 year but not to exceed a total extension of 2 years, provided that if the design standards have been revised by ordinance, such revised standards may govern.

[*N.J.S.A.* 40:55D–49a–c.]

\* \* \* \* \* \* \* \*

The planning board shall grant final approval [of site plans] if the detailed drawings, specifications and estimates of the application for final approval conform to the standards established by ordinance for final approval [and] the conditions of preliminary approval * * *.

[*N.J.S.A.* 40:55D–50a.]

\* \* \* \* \* \* \* \*

The zoning requirements applicable to the preliminary approval first granted and all of the rights conferred upon the developer pursuant to [*N.J.S.A.* 40:55D–49] * * * shall not be changed for a period of two years after the date on which the resolution of final approval is adopted * * *. If the developer has followed the standards prescribed for final approval * * * the planning board may extend such period of protection for extensions of one year but not to exceed three extensions. Notwithstanding any other provisions of this act, the granting of final approval terminates the time period of preliminary approval pursuant to [*N.J.S.A.* 40:55D–49] * * *.

[*N.J.S.A.* 40:55D–52a.]

The statutory scheme is self-evident. Preliminary approval of a site plan protects an applicant from zoning changes unrelated to public health and safety for a minimum of three years and, subject to municipal consent, for an additional period of two years. The issuance of final site-plan approval terminates the protection afforded by preliminary site-plan approval and confers additional protection against zoning changes unrelated to public health and safety for a minimum period of two years, with extensions for an additional period of three years, subject to municipal consent. Thus, the Legislature has authorized protection to be extended to developers from zoning changes, based on preliminary and final site-plan approval, that extend over a period of ten years, demonstrating a clear legislative purpose to insulate commercial-development projects that obtain local planning-board approval from subsequently-enacted more restrictive municipal-zoning provisions.

Although the statutory provision authorizing the grant of final site-plan approval does not specifically provide that that approval must precede the issuance of a building permit, the text of the statute quite clearly conveys that objective: "The planning board

shall grant final approval if the detailed drawings, specifications and estimates of the application for final approval conform to the standards established by ordinance [and] the conditions of preliminary approval * * *." *N.J.S.A.* 40:55D–50a. The statutory language includes not the slightest hint that final site-plan approval is anticipated to be issued after construction has been completed. The requirement that the drawings, specifications, and estimates conform to the ordinance and to the conditions of preliminary approval unmistakably conveys the legislative intent that final site-plan approval is to be sought and obtained prior to the issuance of a building permit.

No reference to site-plan approval is found in the predecessor to the MLUL, the Municipal Planning Act (1953), *L.*1953, *c.* 433 (repealed by *L.*1975, *c.* 291). To the extent that any insight into the intended relationship between preliminary and final site-plan approval can be discerned from antecedent planning statutes, the earliest statutory authorization of a two-stage approval process is found in the Municipal Planned Unit Development Act (1967), *L.*1967, *c.* 61 (repealed by MLUL, *L.*1975, *c.* 291). The procedure for approval of planned-unit developments set forth in that statute required that the developer first obtain tentative approval, which was to be followed by final approval. See *L.*1967, *c.* 61, §§ 8, 9. That statute expressly provided that "tentative approval of a plan shall not qualify a plat of the planned unit development for recording *nor authorize development or the issuance of any building permits.*" *L.*1967, *c.* 61, § 8(b). The provisions of the MLUL that require preliminary and final approval of a site plan appear to have been modelled after the tentative- and final-approval provisions applicable to planned-unit developments, but the restriction on the issuance of building permits as an incident of tentative approval was not carried over into the MLUL.

Nevertheless, the legislative intent would appear to be crystal clear. As the majority indicates, the trial court had observed that the better practice and the normal practice is that "in most municipalities there is a final site plan approval before a permit is

issued." One of the State's leading authorities on planning and zoning also expresses no doubt about the statutory scheme:

> *There can be no commencement of construction and, in fact, no issuance of a* *building permit until final approval of a site plan has been obtained.* The statutory protections following a preliminary approval are primarily to benefit the large scale developer who will require a period of time to complete administrative coordination and production of his development, getting together all necessary approvals, for example, and who needs insulation from changes in the zoning ordinance requirements for a period long enough to complete that entire phase of the project. (In the case of small projects, it is customary for both preliminary and final site plan approval to be considered at the same time * * *."
>
> [William M. Cox, *New Jersey Zoning & Land Use Administration,* § 15–5.2 (1993) (emphasis added).]

Contrary to the majority's observation that the invalidity of the provision of the Montville ordinance authorizing a building permit prior to final site-plan approval is irrelevant, the case before us would have been quite different had the Montville ordinance complied with the obvious intent of the MLUL. Palatine would have been required to obtain final site-plan approval before proceeding to construct any portion of the building. The issuance of final site-plan approval would have protected Palatine against zoning changes for a minimum of two years with the possibility of three one-year extensions. Undoubtedly, Palatine would have had a clearer understanding of the extent of the protection from zoning changes afforded the project had final site-plan approval been sought and obtained prior to the commencement of construction. Moreover, Palatine would have been spared the anomaly of having to apply for final site-plan approval after the project had been half completed. In my view, an informed application of the doctrine of equitable estoppel on an adequate record would have included consideration of the municipality's responsibility for having adopted and implemented an ordinance that invalidly authorized issuance of a building permit to Palatine prior to final site-plan approval.

B. Equitable Estoppel.

*Tremarco Corp. v. Garzio,* 32 *N.J.* 448, 161 *A.*2d 241 (1960), one of this Court's earliest applications of the doctrine of equitable

estoppel, suggests that neither the lack of site-plan approval nor the expiration of a building permit is a bar to relief against a subsequently-enacted zoning-ordinance amendment. The plaintiff's predecessor had obtained a valid building permit to construct a public garage and service station in June 1957, the Municipal Planning Act (1953), *L.*1953, *c.* 433, then in effect imposing no requirements concerning site-plan approval. Relying on the permit and the zoning-ordinance provisions authorizing the use, the plaintiff agreed to purchase the property. *Id.* at 451, 161 *A.*2d 241. The plaintiff was aware that the local building code required revocation of any permit in respect of which construction had not commenced within ninety days of issuance, but had been assured that the permit could be renewed. The plaintiff acquired the property, entered into a contract for construction of the building at a cost of $31,412, and accepted delivery of storage tanks. The building permit was reissued in October 1957 and March 1958. Because of protests from township residents, the building inspector revoked the permit in April 1958. *Id.* at 451–52, 161 *A.*2d 241. In June 1958, the municipality enacted an ordinance amendment barring construction of gasoline stations on the property. A September 1958 amendment rezoned the plaintiff's property from business to residential use. *Id.* at 452, 161 *A.*2d 241.

In the ensuing litigation, the plaintiff urged that the municipality was estopped from revoking a validly-issued building permit when substantial expenditures had been made in reliance on the permit; the municipality argued that the lack of any construction demonstrated that the plaintiff's reliance was insubstantial, and that the ordinance then in effect governed the permitted use of the property. *Id.* at 454–55, 161 *A.*2d 241. This Court, concluding that "the equities strongly predominate in favor of plaintiff," *id.* at 458, 161 *A.*2d 241, explained the balancing process that courts must invoke to decide estoppel-type issues:

> In general terms the rule is that where the permit is regularly issued in accordance with the zoning ordinance, it may not be revoked after reliance. It must be determined at what point it can be said that an individual has performed acts which form the wellspring from which certain protectable interests may flow and create a countervailing force which will prevail over the normally paramount

authority of the municipality to preserve the desirable characteristics of the community through zoning. As was pointed out by Judge Conford in *Roselle [v. Mayor and Council of Borough of Moonachie,* 49 *N.J.Super.* 35, 40, 139 *A.*2d 42 (App.Div.1958) ], the basic problem is "as to the stage of utilization of an individual's property which should be regarded as immunizing it from the ban of a subsequently adopted prohibitory zoning regulation." * * *

* * * * * * * *

There is no easy formula to resolve issues of this kind. The ultimate objective is fairness to both the public and the individual property owner. We think there is no profit in attempting to fix some precise concept of the nature and *quantum* of . reliance which will suffice. Rather a balance must be struck between the interests of the permittee and the right and duty of the municipality through planning and the implementation of that scheme through zoning "to 'make, ordain and establish all manner of wholesome and of reasonable laws, not repugnant to the Constitution,' as may be deemed to be 'for the good and welfare of the commonwealth, and all the subjects of the same.'" *Roselle v. Wright,* 21 *N.J.* 400, 408–409 [122 *A.*2d 506] (1956). This right is one of which the permittee is deemed to be aware.

[*Id.* at 456–57, 161 *A.*2d 241 (citations omitted).]

In *Gruber v. Mayor of Raritan,* 39 *N.J.* 1, 186 *A.*2d 489 (1962), the equitable-estoppel issue arose in connection with a five-section, 131–acre residential development, the subdivisions for which had been approved by the municipality in 1956, prior to the effective date of the municipality's land-subdivision ordinance. Work on four model homes in the subdivision's first section was substantially completed during 1957, together with related curbs, sidewalks, road grading, and utility poles. Although the development of the tract was "relatively dormant" from 1957 to the fall of 1958, *id.* at 6, 186 *A.*2d 489, the Township Committee granted extensions of time for the filing of subdivision plats, and the Township's first zoning ordinance provided that the 131–acre tract was zoned for residential use. The plaintiffs had acquired the property from the initial developer in 1958, making payments and assuming obligations in excess of $500,000. *Ibid.* In 1959 the Township rezoned the entire tract for light industrial use, prohibiting residential development. *Id.* at 8, 186 *A.*2d 489. This Court's treatment of the estoppel issue, which resulted in a holding that the Township was estopped from prohibiting development of the subdivision's first section, and a remand for development of a more adequate factual record concerning the other four sections, took

into account both the developer's delay and the municipality's encouragement of the project:

> We are here confronted with a case in which the development originated before the municipality had any planning board or land subdivision ordinance and in which the developer (and his successors) prosecuted the development thereafter with substantial efforts and expenditures and with consistency though "haltingly and with interruptions." 73 *N.J.Super.*, [73 *N.J.Super.* 120] at p. 128 [179 *A.*2d 145] [ A.D.1962) ]. It is significant that when there were interruptions the municipality did nothing whatever towards expedition of the development nor did it do anything to suggest to the developer that his interests would be in jeopardy if he did not proceed in faster fashion. On the contrary, the municipality granted formal approvals and extensions which on their face avoided defaults and justified the developer's reliance. Although the Law Division was of the opinion that these approvals and extensions were wholly *ultra vires* in the primary sense and therefore could not furnish any support whatever for the claim of equitable estoppel or vested rights, we do not so regard them.

> \* \* \* \* \* \* \* \*

> The Township has advanced technical arguments which need not detain us since they have little substance and no relation to the equities of the case. The fact is that it is seeking to disavow its commitments to a developer with whom it has not dealt at all fairly. When it belatedly became alarmed at its residential growth, it did not seek to work out a reasonable solution with the developer which might have reduced the number of planned houses and at the same time have permitted the developer to proceed so as to retrieve its investment with a reasonable return. Instead, it abruptly took action which was designed to exclude all residential building and occupancy, even in section 1 where four model homes had already been built, curbs and sidewalks had been placed, road grading and graveling had been done, utility poles had been installed, and other work had been completed. Insofar as section 1 is concerned, the plaintiffs' claim for relief rests firmly on elemental considerations of justice and comes well within the equitable principles expressed in *Tremarco Corporation v. Garzio, supra.* And it may very well be that the plaintiffs' claim should also be sustained with respect to some or all of the remaining sections within the principles expressed as to sectional developments in *Telimar Homes, Inc. v. Miller,* [14 *A.D.*2d 586, 218 *N.Y.S.*2d 175 (App.Div.1961) ]. *However, we are not now prepared to determine that issue because of the somewhat uncertain state of the record and the absence of any findings in the Law Division.* There are vital public as well as private interests and *we believe that the safer course would be to remand the case to the Law Division for its findings and determination after the taking of more detailed testimony, particularly with respect to the precise nature and extent of the plaintiffs' expenditures and good faith reliance* and the practicability and fairness of restricting the residential development to any section or sections less than the entire tract.

> [*Id.* at 17–19, 186 *A.*2d 489 (emphasis added) (citations omitted).]

The issue of the adequacy of a record for the purpose of resolving an equitable-estoppel issue also was addressed in *Sautto*

v. *Edenboro Apartments, Inc.,* 69 *N.J.Super.* 420, 174 *A.*2d 497 (App.Div.1961). The plaintiffs had challenged the validity of a building permit to construct a five-story, sixty-four-unit apartment house in the City of Orange that failed to conform with the sideyard-setback provisions of the zoning ordinance adopted after issuance of the building permit. The defendant contended that it had incurred substantial expenditures in reliance on the permit, and had continued construction on the project while the litigation was pending. In reversing the trial court's grant of summary judgment for the defendant, the Appellate Division, in an illuminating opinion by Judge Conford, elaborated on the need for an adequate factual record in deciding whether a developer's reliance was sufficient to bar application of a subsequent zoning-ordinance amendment:

> We are thus brought to defendant builders' alternative contention of substantial reliance upon the permit. * * * These decisions, taken together, indicate that where a property owner has been granted a building permit for a use valid when granted, the municipality nevertheless has a right to adopt later zoning or other police power legislation restrictive of the enjoyment of the permit already issued, but not where the permittee in reliance upon the permit has made substantial investment or expenditure, or where the extent of his reliance and the nature of the behavior of the parties show a balance of the equities strongly in favor of the permittee as against the general public represented by the municipal authorities (or, as here, a complaining taxpayer-owner).
>
> Each case presents a question of fact peculiar to its own concatenation of circumstances. No "easy formula" is available for resolution of such issues. "The ultimate objective is fairness both to the public and the individual property owner." *It is obvious, however, that the complex variety of factors which must control such a determination emphasizes the desirability of reaching a judicial conclusion upon them by plenary hearing rather than on the basis of opposing sets of affidavits,* which frequently are heavily larded with lawyer-dictated conclusions and hearsay, and characterized by absence or minimization of illuminating detail of potentially harmful import to the cause being aided by the affiant.
>
> [*Id.* at 429–30, 174 A.2d 497 (quoting *Tremarco Corp., supra,* 32 *N.J.* at 457, 161 A.2d 241) (emphasis added).]

On remand, the Law Division entered judgment for the plaintiffs, which would have required substantial demolition of the apartment house. The Appellate Division reversed, concluding that "the judgment under review imposes a disproportionate and unconscionable hardship upon defendants and that the equities viewed from the total record do not preponderate in favor of

plaintiffs." 84 *N.J.Super.* 461, 478, 202 *A.*2d 466, *certif. denied,* 43 *N.J.* 353, 204 *A.*2d 588 (1964).

Our precedents persuasively emphasize both the equitable focus of the estoppel doctrine and that its proper application depends critically on the production of proofs sufficient to permit a balanced consideration of the competing interests. No litmus test—such as expiration of a building permit—is determinative. As the Appellate Division observed in *Urban Farms, Inc. v. Borough of Franklin Lakes,* 179 *N.J.Super.* 203, 431 *A.*2d 163, *certif. denied,* 87 *N.J.* 428, 434 *A.*2d 1099 (1981), in denying retroactive application of a post-judgment zoning-ordinance amendment to a nursing home developer that successfully had challenged the municipality's denial of a special exception use permit,

[w]e do not regard the issuance of a building permit as a *sine qua non* to the applicability of the substantial reliance doctrine. Rather, we are of the view that its applicability requires a weighing of such factors as the nature, extent and degree of the public interest to be served by the ordinance amendment on the one hand and, on the other hand, the nature, extent and degree of the developer's reliance on the state of the ordinance under which he has proceeded, the extent to which his undertaking has been at any point approved or encouraged by official municipal action, and the extent to which, under the circumstances and as objectively determined, he should have been aware that the municipality would be likely to change the ordinance prior to actual commencement of construction. These are the factors constituting the developer's special equities, and if they outweigh the public interest concerns, they should also operate to bar post-judgment retroactivity of a zoning ordinance amendment. ·

We are satisfied from the record before us that the developer's special equities here are not only substantial but also that they are superior to the public interest purportedly served by the amendment. * * * The developer patently expended substantial sums for project development on the basis of the original approval. It had no reason to believe that the ordinance would be amended in midstream after its seven years of dedication to the project which followed the municipality's original approval. For all of these reasons, we are satisfied that retroactive application in these circumstances would be fundamentally unfair.

[*Id.* 179 *N.J.Super.* at 221–22, 431 *A.*2d 163 (citation omitted).]

The majority has concluded correctly that a·developer cannot delay completion of a project indefinitely and claim exemption from all future zoning amendments solely on the basis of reliance on the original permit. In that respect, the record is troubling because *no representation was made concerning when* construction of the balance of the project would resume, assuming munici-

pal approval was forthcoming. However, the majority misconceives the estoppel doctrine when it observes, *ante* at 563, 628 *A*.2d at 330, that Palatine's reliance on its building permit was "unreasonable and unjustified and does not warrant the application of equitable estoppel." Reliance on the building permit and proof of prejudice resulting from application of the amended zoning ordinance are the very essence of a claim for relief based on the equitable-estoppel doctrine.

The unique facts of this case may have diverted the parties from adequately presenting evidence sufficient to permit a reasoned and comprehensive disposition based on the doctrine of equitable estoppel. In my view, the Court should remand this matter to the Law Division to permit development of a full record at a plenary trial, in which proceeding the municipality should be joined. The issue presented is one of first impression, and we serve neither the interests of the litigants nor the interests of justice by a disposition that is uninformed by proofs that thoroughly reveal the respective equities of the parties.

Justices CLIFFORD and O'HERN join in this opinion.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK and GARIBALDI—4.

*For reversal and remandment*—Justices CLIFFORD, O'HERN and STEIN—3.